IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP,

*Plaintiff*,

v.

Civil Action No. _______

CORD BYRD, in his official capacity as Secretary of State of Florida; KIM BARTON, in her official capacity as Supervisor of Elections for Alachua County; CHRIS MILTON, in his official capacity as Supervisor of Elections for Baker County; NINA WARD, in her official capacity as Supervisor of Elections for Bay County; AMANDA SEYFANG, in her official capacity as Supervisor of Elections for Bradford County; TIM BOBANIC, in his official capacity as Supervisor of Elections for Brevard County; JOE SCOTT, in his official capacity as Supervisor of Elections for Broward County; SHARON CHASON, in her official capacity as Supervisor of Elections for Calhoun County; LEAH VALENTI, in her official capacity as Supervisor of Elections for Charlotte County; MAUREEN "MO" BAIRD, in her official capacity as Supervisor of Elections for Citrus County; CHRIS H. CHAMBLESS, in his official capacity as Supervisor of Elections for Clay County; MELISSA R. BLAZIER, in her official capacity as Supervisor of Elections for Collier County; TOMI STINSON BROWN, in her official capacity as Supervisor of Elections for Columbia County; DEBBIE WERTZ, in her official capacity as Supervisor of Elections for DeSoto County; DARBI CHAIRES, in her official capacity as Supervisor of Elections for Dixie County; JERRY HOLLAND, in his official capacity as Supervisor of Elections for Duval County; ROBERT D. BENDER, in his official capacity as Supervisor of Elections for Escambia

County; KAITI LENHART, in her official capacity as Supervisor of Elections for Flagler County; HEATHER RILEY, in her official capacity as Supervisor of Elections for Franklin County; KENYA PONDER WILLIAMS, in her official capacity as Supervisor of Elections for Gadsden County; LISA DARUS, in her official capacity as Supervisor of Elections for Gilchrist County; ALETRIS FARNAM, in her official capacity as Supervisor of Elections for Glades County; RHONDA H. PIERCE, in her official capacity as Supervisor of Elections for Gulf County; LAURA HUTTO, in her official capacity as Supervisor of Elections for Hamilton County; DIANE SMITH, in her official capacity as Supervisor of Elections for Hardee County; SHERRY TAYLOR, in her official capacity as Supervisor of Elections for Hendry County; DENISE LAVANCHER, in her official capacity as Supervisor of Elections for Hernando County; KAREN HEALY, in her official capacity as Supervisor of Elections for Highlands County; CRAIG LATIMER, in his official capacity as Supervisor of Elections for Hillsborough County; H. RUSSELL "RUSTY" WILLIAMS, in his official capacity as Supervisor of Elections for Holmes County; LESLIE ROSSWAY SWAN, in her official capacity as Supervisor of Elections for Indian River County; CAROL A. DUNAWAY, in her official capacity as Supervisor of Elections for Jackson County; MICHELLE MILLIGAN, in her official capacity as Supervisor of Elections for Jefferson County; TRAVIS HART, in his official capacity as Supervisor of Elections for Lafayette County; ALAN HAYS, in his official capacity as Supervisor of Elections for Lake County; JENNA PERSONS-MULICKA, in her official capacity as acting Supervisor of Elections for Lee County; MARK S. EARLEY, in his official capacity as Supervisor of Elections for Leon County; TAMMY JONES, in her official capacity as Supervisor of Elections for Levy County; GRANT CONYERS, in his official capacity as Supervisor of Elections for Liberty County; HEATH DRIGGERS, in his official capacity as Supervisor of Elections for Madison County; SCOTT FARRINGTON, in his official capacity

as Supervisor of Elections for Manatee County; WESLEY WILCOX, in his official capacity as Supervisor of Elections for Marion County; VICKI DAVIS, in her official capacity as Supervisor of Elections for Martin County; ALINA GARCIA, in her official capacity as Supervisor of Elections for Miami-Dade County; SHERRI HODIES, in her official capacity as Supervisor of Elections for Monroe County; JANET H. ADKINS, in her official capacity as Supervisor of Elections for Nassau County; PAUL LUX, in his official capacity as Supervisor of Elections for Okaloosa County; DAVID MAY, in his official capacity as Supervisor of Elections for Okeechobee County; KAREN CASTOR DENTEL, in her official capacity as Supervisor of Elections for Orange County; MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for Osceola County; WENDY SARTORY LINK, in her official capacity as Supervisor of Elections for Palm Beach County; BRIAN E. CORLEY, in his official capacity as Supervisor of Elections for Pasco County; JULIE MARCUS, in her official capacity as Supervisor of Elections for Pinellas County; MELONY BELL, in her official capacity as Supervisor of Elections for Polk County; CHARLES L. OVERTURF III, in his official capacity as Supervisor of Elections for Putnam County; TAPPIE A. VILLANE, in her official capacity as Supervisor of Elections for Santa Rosa County; RON TURNER, in his official capacity as Supervisor of Elections for Sarasota County; AMY PENNOCK, in her official capacity as Supervisor of Elections for Seminole County; VICKY OAKES, in her official capacity as Supervisor of Elections for St. Johns County; GERTRUDE WALKER, in her official capacity as Supervisor of Elections for St. Lucie County; WILLIAM "BILL" KEEN, in his official capacity as Supervisor of Elections for Sumter County; JENNIFER KINSEY, in her official capacity as Supervisor of Elections for Suwannee County; DANA SOUTHERLAND, in her official capacity as Supervisor of Elections for Taylor County; DEBORAH OSBORNE, in her official capacity as Supervisor of Elections for Union County;

LISA LEWIS, in her official capacity as Supervisor of Elections for Volusia County; JOSEPH R. MORGAN, in his official capacity as Supervisor of Elections for Wakulla County; RYAN MESSER, in his official capacity as Supervisor of Elections for Walton County; and DEIDRA MALLOY PETTIS, in her official capacity as Supervisor of Elections for Washington County,

*Defendants*.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff Florida State Conference of Branches and Youth Units of the NAACP files this Complaint for Injunctive and Declaratory Relief against Defendants Cord Byrd, in his official capacity as Florida Secretary of State (the "Secretary"), and Florida's 67 Supervisors of Elections, each in their official capacities as Supervisors for their respective counties (collectively, "Supervisors").

**NATURE OF THE CASE**

1. Florida House Bill 991 is the latest in a wave of Florida legislation that purports to advance "election integrity." In actuality, it is the latest installment in an extended scaremongering campaign about imagined threats to Florida's elections that will make it harder for lawful, eligible voters to successfully vote. Here, Plaintiff challenges a narrow and specific aspect of HB 991: its sudden removal of student IDs from the list of acceptable forms of ID that voters may use to satisfy Florida's voter ID law and successfully cast a ballot (the "Student ID Ban").

2. Since the Florida Legislature first codified the requirement that voters present photo ID at the polls more than 20 years ago, students at Florida's many colleges and universities have been able to use their student ID to vote. They have done so without issue. Yet, earlier this year, Florida suddenly removed student IDs from the list of acceptable forms of voter ID with the

enactment of HB 991, which was signed into law by Governor DeSantis on April 1, 2026. Student ID is a specific form of ID that is possessed almost exclusively by tens of thousands of Florida's youngest voters. HB 991 accordingly targets these voters for disfavored treatment.

3. Florida law does not exclude any other category of government-issued photo ID in this way. In fact, HB 991 otherwise *expanded* a preexisting category of voter ID under Fla. Stat. § 101.043(1)(a)(12), covering government employee ID cards, into a catch-all provision encompassing *any* photo ID issued by the federal government, the State of Florida, or any Florida county or municipality. The bill carves out only *one* exception to the otherwise blanket rule that IDs issued by Florida governmental entities may be used for voter ID purposes, expressly prohibiting the use of any IDs issued by a public *educational institution*.

4. This targeted attack on a form of ID used exclusively by students is certain to disenfranchise young voters who are far more likely to have student ID and, for many reasons, disproportionately likely to lack other accepted forms of voter ID. Nor is there any reasonable explanation for HB 991's disparate treatment of student IDs other than a transparent attempt to make it harder for the state's youngest voting population to successfully access the franchise. The justifications that lawmakers and Governor DeSantis offered in defense of the new law are so nonsensical that they "reek of pretext." *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1222 (N.D. Fla. 2018).

5. First, the Governor defended the new prohibition on the use of student IDs at the polls by noting that such ID does not prove Florida residency. The problem with this explanation is that *most* forms of voter ID that HB 991 leaves in place as acceptable voter ID likewise do not establish Florida residency, including passports, military ID, and concealed carry permits. Further, whether a student ID confirms a voter's residency is irrelevant. Florida's voter ID law is not intended to verify eligibility information, like residency; its voter registration process establishes eligibility well before

any particular election. The voter ID law exists simply to ensure that the person who appears to vote is who they claim to be.

6. Second, lawmakers also argued that student IDs are unreliable because they are issued by third-party institutions and not the state. But this makes no sense as hundreds of thousands of student IDs are issued by *Florida State* colleges and universities. Indeed, the bill itself acknowledges as much when it expressly carves out any ID issued by any "educational institution" from its otherwise blanket approval of IDs issued by any Florida State entity as voter ID. Opponents of the bill suggested that a compromise provision prohibiting only student IDs issued by *private* institutions would more narrowly address any security concerns. But when an amendment proposing this change was introduced in the Senate, it was voted down. And there was *zero* evidence in the legislative record of even a single instance of voter fraud facilitated by use of a student ID.

7. Although HB 991's Student ID Ban will advance no legitimate state interest, it *will* make it harder for a specific group of Floridians—young voters—to participate in Florida's elections. Young voters are overwhelmingly more likely to be students than older voters. And young voters are far less likely to have other accepted forms of voter ID, such as a Florida driver's license or passport.

8. By prohibiting the use of student ID to vote, the Student ID Ban directly targets students and intentionally abridges young voters' right to vote in violation of the Twenty-Sixth Amendment to the U.S. Constitution. And by singling out student voters for disparate treatment and unduly burdensome requirements to access the franchise without any corresponding justification, the Student ID Ban also violates the First and Fourteenth Amendments under the *Anderson-Burdick* framework.

9. As Florida State Representative Anna V. Eskamani, a member of the House Committee that considered HB 991, put it during floor debate, "there is no way [to] sugarcoat" HB 991: the Legislature "intentionally m[ade] it harder for students to vote." Injunctive relief from this

Court is necessary to protect young Floridians' access to the electoral franchise. If not enjoined, HB 991 will take effect on January 1, 2027.

## JURISDICTION AND VENUE

10. Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the U.S. Constitution, specifically by the First, Fourteenth, and Twenty-Sixth Amendments.

11. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under the Constitution and laws of the United States and asserts the deprivation, under color of state law, of rights secured by the Twenty-Sixth Amendment's guarantee against denial or abridgement of the right to vote on account of age, the Fourteenth Amendment's guarantee of equal protection of the laws, and the First and Fourteenth Amendment's protection against undue burdens on the right to vote.

12. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants are residents of Florida and numerous Defendants reside in this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiff's claims for relief occurred in this district.

13. This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14. Plaintiff Florida State Conference of Branches and Youth Units of the NAACP ("Florida NAACP") is a nonprofit, nonpartisan civil rights organization in Florida. Founded in 1909, Florida NAACP is the oldest civil rights organization in Florida and serves as the umbrella organization for local branch units throughout the State. Florida NAACP is headquartered in Fort Lauderdale, Florida, and its 12,000 members are predominantly Black and other minority individuals

who reside in all 67 of Florida's counties. Florida NAACP's mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination.

15. For decades, Florida NAACP has engaged in statewide voter registration, public education, and advocacy to encourage civic and electoral participation among its members and other voters. For example, Florida NAACP holds registration events in coordination with local partners such as the Divine-Nine Pan-Hellenic Council, the Links, Masonic Lodges, and others. Florida NAACP also works with churches and other faith-based organizations to help register voters within the communities it serves.

16. Florida NAACP engages in other voting-related advocacy as well, such as facilitating trainings to help its members understand election-related bills, amendments, and other issues affecting the voting process. Florida NAACP also holds get-out-the vote ("GOTV") events, such as "souls to the polls," where Florida NAACP offers transportation from local churches to polling places. Outside of the electoral sphere, Florida NAACP also engages in advocacy work involving health care, criminal justice, the school-to-prison pipeline, education, environmental justice, climate change, and the economy.

17. Florida NAACP's Youth & College Division specifically supports youth units at high schools and colleges across the state. The mission of the Youth & College Division is to advance the economic, educational, social, and political status of Black and other minority individuals, as well as to train and develop student members' leadership skills in service of increased social and political activism. Florida NAACP maintains six active college and university units, with a combined membership of nearly 400 students, many of whom rely on student ID to vote.

18. HB 991's Student ID Ban threatens substantial harm to Florida NAACP's members. The overwhelming majority of Florida NAACP members are registered Florida voters who regularly participate in elections. Specifically, several members of Florida NAACP's Youth Units are currently

enrolled students who rely on their student ID to vote, and who lack alternative qualifying ID under Fla. Stat. § 101.043.

19. HB 991's Student ID Ban will also affect the magnitude and impact of Florida NAACP's get-out-the-vote efforts. Although Florida NAACP will still strive to successfully assist voters in turning out to vote, its efforts will be frustrated by the Student ID Ban, in several ways.

20. HB 991's Student ID Ban will force Florida NAACP to expend its limited resources to create entirely new educational resources directed at the State's student population, attempting to explain Florida's revised voter ID requirements and how to obtain ID from the newly condensed list of qualifying documents.

21. For those voters who have previously relied on student ID to vote, Florida NAACP will need to assist its members, constituents, and other voters attempting to comply with HB 991's more restrictive voter ID requirement. This, too, will require new educational resources and limited staff and volunteer time that will now have to be dedicated to helping voters understand the various forms of acceptable ID, persuading them to comply, helping them obtain it, and assisting them in providing such documentation to their Supervisor of Elections.

22. These efforts will deplete Florida NAACP's existing resources and will result in fewer voters who can vote in upcoming elections. Given the importance of civic engagement to Florida NAACP, these efforts will have to be prioritized at the expense of the organization's other educational programming on policy issues that are important to its communities, such as healthcare and SNAP benefits.

23. Defendant Cord Byrd is sued in his official capacity as Secretary of State of Florida. Defendant Byrd is the head of the Florida Department of State (the "Department") and the chief election officer of the State. Fla. Stat. § 97.012. The Secretary is responsible for ensuring uniform interpretation and implementation of election laws. *Id.* § 97.012(1)–(2).

24. Defendants Supervisors of Elections, who are sued in their official capacities only, are responsible for administering elections and maintaining voter rolls in each of Florida's 67 counties. Under Fla. Stat. § 101.043(1)(a), the Supervisors are responsible for ensuring that registered voters present an authorized form of voter ID at the polls. The Supervisors also sit on the ballot canvassing boards that conduct signature matching for any provisional ballot a voter submits if they lack acceptable voter ID.

25. Defendants Supervisors of Elections are: Kim Barton, for Alachua County; Chris Milton, for Baker County; Nina Ward, for Bay County; Amanda Seyfang, for Bradford County; Tim Bobanic, for Brevard County; Joe Scott, for Broward County; Sharon Chason, for Calhoun County; Leah Valenti, for Charlotte County; Maureen "Mo" Baird, for Citrus County; Chris H. Chambless, for Clay County; Melissa R. Blazier, for Collier County; Tomi Stinson Brown, for Columbia County; Debbie Wertz, for DeSoto County; Darbi Chaires, for Dixie County; Jerry Holland, for Duval County; Robert D. Bender, for Escambia County; Kaiti Lenhart, for Flagler County; Heather Riley, for Franklin County; Kenya Ponder Williams, for Gadsden County; Lisa Darus, for Gilchrist County; Aletris Farnam, for Glades County; Rhonda H. Pierce, for Gulf County; Laura Hutto, for Hamilton County; Diane Smith, for Hardee County; Sherry Taylor, for Hendry County; Denise LaVancher, for Hernando County; Karen Healy, for Highlands County; Craig Latimer, for Hillsborough County; H. Russell "Rusty" Williams, for Holmes County; Leslie Rossway Swan, for Indian River County; Carol A. Dunaway, for Jackson County; Michelle Milligan, for Jefferson County; Travis Hart, for Lafayette County; Alan Hays, for Lake County; Jenna Persons-Mulicka, as acting Supervisor for Lee County; Mark S. Earley, for Leon County; Tammy Jones, for Levy County; Grant Conyers, for Liberty County; Heath Driggers, for Madison County; Scott Farrington, for Manatee County; Wesley Wilcox, for Marion County; Vicki Davis, for Martin County; Alina Garcia, for Miami-Dade County; Sherri Hodies, for Monroe County; Janet H. Adkins, for Nassau County; Paul Lux, for Okaloosa

County; David May, for Okeechobee County; Karen Castor Dentel, for Orange County; Mary Jane Arrington, for Osceola County; Wendy Sartory Link, for Palm Beach County; Brian E. Corley, for Pasco County; Julie Marcus, for Pinellas County; Melony Bell, for Polk County; Charles L. Overturf III, for Putnam County; Tappie A. Villane, for Santa Rosa County; Ron Turner, for Sarasota County; Amy Pennock, for Seminole County; Vicky Oakes, for St. Johns County; Gertrude Walker, for St. Lucie County; William "Bill" Keen, for Sumter County; Jennifer Kinsey, for Suwannee County; Dana Southerland, for Taylor County; Deborah Osborne, for Union County; Lisa Lewis, for Volusia County; Joseph R. Morgan, for Wakulla County; Ryan Messer, for Walton County; Deidra Malloy Pettis, for Washington County.

## STATEMENT OF FACTS AND LAW

### I. HB 991 removes student IDs from Florida's list of acceptable voter identification.

26. Voter ID has long been a feature of Florida's elections. The Legislature first codified a voter ID requirement in 1977, and it amended the provision to require *photo* ID in 1998. For several decades, the Legislature did not dictate which forms of ID would satisfy the requirement. *See* Fla. Stat. § 98.461 (1998). Instead, that responsibility originally lay with the Secretary of State. *Id.*

27. The Legislature first codified a statutory list of acceptable forms of voter ID in 2003. *See* Fla. Stat. § 101.043(1) (2003). Student ID was included on this list, along with 11 other forms of ID that would be accepted if they included the voter's photo. *Id.* § 97.0535(3)(a)(4) (2003).

28. For more than 20 years, Florida's student population was able to vote at the polls using their student ID. The legislative record for HB 991 fails to reference even a *single* incident of illegal voting or other voter fraud associated with using a student ID at the polls during this time period.

29. HB 991 marks a sharp reversal in Florida's long-standing approach to voter ID. Under the new law, Floridians may no longer rely on student ID, debit/credit cards, retirement center ID,

neighborhood association ID, or public assistance ID, if not issued by the federal government, the State of Florida, or any Florida county or municipality, as voter ID. *See* Ch. 2026-26, § 13, Laws of Fla. ("HB 991"). HB 991 likewise removes the same types of ID from the lists of acceptable ID that Floridians may use (a) if they are a first-time voter who has voted by mail under Fla. Stat. § 101.6923 without yet submitting any proof of identification; and (b) to cure a missing or mismatched signature on a mail or provisional ballot. HB 991 §§ 14, 20.

30. HB 991 further singles out student ID from an otherwise neutral catch-all provision for government-issued ID, which plainly would have included student IDs issued by public universities in Florida. HB 991 includes a provision allowing voters to use *any* photo ID issued by the federal government, the State of Florida, or any Florida county or municipality—with only one notable exclusion: "identification cards issued by an educational institution." HB 991 § 13.

31. Because of these amendments, registered Floridians may cast a regular ballot only if they present a Florida driver's license; Florida ID card; U.S. passport or passport card; U.S. uniformed services or Merchant Marine ID; veteran health ID card issued by the VA; a concealed carry license; or other ID card issued by the federal government, the State of Florida, or a Florida county or municipality—*except* one issued by an educational institution. HB 991 § 13.

32. If a voter appears at the polls without an acceptable form of voter ID, Florida law allows them to cast a provisional ballot. *See* Fla. Stat. § 101.048(1). With the provisional ballot, a voter must fill out a "voter's certificate" attesting to their identity and eligibility. The canvassing board then must determine whether the signature on the certificate matches the voter's signature in either the registration or precinct books. *See id*. § 101.048(2)(b)(1).

33. If election officials cannot match the voter's signature, or a signature is missing, the voter must take additional steps to ensure their vote is ultimately counted. Here again, HB 991 makes this process more complicated for student voters.

34. For a provisional ballot that fails signature matching to be counted, the voter must submit a "cure" affidavit (a distinct document from the "voter's certificate" that accompanies a provisional ballot in the first place) that includes a copy of acceptable voter ID. *See id.* § 101.048(6)(b). State law divides the list of acceptable IDs at this stage into two "tiers." If a voter lacks any of the "tier 1" IDs—which encompass the same list of acceptable voter ID identified above—the voter may cure their provisional ballot using a "tier 2" ID that shows both the voter's name and current address, including a utility bill; a bank statement; a government check; a paycheck; or government document, excluding a voter information card. *Id.*

35. In short, if the canvassing board is unable to match the signature on the provisional ballot certificate with the signature on the voter's registration or precinct register, the voter must take affirmative steps to cure their ballot by presenting either Tier 1 photo ID or, lacking that, Tier 2 non-photo ID to have their vote counted. Student ID is not an acceptable option under any circumstance.

36. The Legislature passed HB 991 on March 12, 2026. Nearly three weeks later, it was submitted to the Governor for signature. The Governor signed the bill at the conclusion of a press conference on April 1. If not enjoined, it will take effect on January 1, 2027.

## II. HB 991 is a surgical attack on Florida's youngest voters.

37. With HB 991, Florida has expressly targeted its youngest voters—college and university students—for denial or abridgment of the right to vote.

38. The Student ID Ban targets students on its face. Because student voters are overwhelmingly young, the Ban also targets young people. In 2025, the average age of Florida State

University's nearly 35,000 undergraduates was 20.5.[1] Likewise, the average age of the University of Florida's over 40,000 undergraduate students was 20.25.[2]

39. The State cannot claim ignorance of HB 991's outsized impact on young voters. The legislative record is replete with legislators decrying the Student ID Ban's unjustifiable targeting of young, student voters.

40. Representative Eskamani, for instance, flagged constitutional concerns with "picking and choosing what government IDs you like," noting they could "only assume the reason why you're doing that is that you prefer some types of voters over other types of voters." She further observed that, "by taking away student IDs as a use of verification at the polling location, we are intentionally making it harder for students to vote, and there's no way you can sugarcoat that." She went on to accuse, "That's just what the intention is, especially when there's been no clear evidence of fraud taking place in that arena."

41. Senator Davis likewise cautioned that the Student ID Ban "send[s] a message that voices of the young people are somehow less worthy of participation in our democracy."

42. At least one legislator recalled using her own student ID to vote for the first time, decades earlier. And she identified several more legislators who did the same.

43. Against this backdrop, Representative Rayner questioned what purpose the Student ID Ban could possibly serve, a question that ultimately went unanswered. Indeed, the legislative record reveals more about what the Student ID Ban does *not* achieve than what it does.

---

[1] Fla. State Univ. Off. of Institutional Rsch., 2025 Fact Sheet, https://perma.cc/C48U-VF7A (last visited Sep. 8, 2026).

[2] Univ. of Fla., UF Facts for Media, https://news.ufl.edu/for-media/uf-facts/ (last visited Sep. 8, 2026); Univ. of Fla. Off. of Institutional Plan & Rsch., Common Data Set 2024-2025 – UF Main Campus, https://perma.cc/9YBR-AJEK (last visited Sep. 8, 2026).

44. For example, in a separate exchange pressing the issue, HB 991's sponsor Senator Erin Grall conceded that eligibility is established at registration, not at the polls, and retorted that she had no other information to offer regarding the purpose of the Student ID Ban.

45. Representative Eskamani proposed an amendment that would have allowed voters to present student IDs from state colleges and universities at the polls, consistent with the law's approach to all other government-issued IDs. That amendment was rejected.

46. Despite the criticisms and objections, including concerns raised by students who testified in front of the Legislature, the Student ID Ban passed the Florida Legislature intact.

**III. HB 991 will make it harder for students and younger Floridians to vote.**

47. HB 991's Student ID Ban will eliminate a reliable and secure form of photo ID used to prove identity at the polls, significantly burdening access to the franchise for young people.

48. Because of the Ban, students who would have used their student IDs to comply with Florida's voter ID requirement will be unable to cast a regular ballot unless they have—or can obtain—another form of acceptable photo ID.

49. Students are less likely than other Florida residents to have a Florida driver's license in the first place. At least one recent report has noted that Florida teens are putting off getting their driver's licenses, and new drivers are trending older.[3] The increasingly steep cost of driver's education,[4] cars, insurance, and gas, along with driving-related anxieties, have all contributed to a

---

[3] Jeff Butera, *Growing Number of Florida Teens Are in No Rush to Get Driver's License*, Spectrum Bay News 9 (Feb. 17, 2023), https://perma.cc/ZEL9-A774; *see also* Sarah Cernikoff, *Gen Z Is Less Likely to Have a Driver's License. Here's Why*, USA Today (May 17, 2024), https://perma.cc/T7A4-P4F3; Madeline Holcombe, *Teens Are Delaying Getting Their Driver's Licenses. Parents Want to Know Why*, CNN (Apr. 5, 2025), https://www.cnn.com/2025/04/05/health/teens-delay-driving-wellness.

[4] *See* Fla. Dep't of Highway Safety & Motor Vehicles, *Driver Improvement Schools: Driver Education Traffic Safety (DETS)*, FLHSMV.gov, https://perma.cc/EV5F-2TSP (last visited Sep. 9, 2026).

steep decline in young drivers. College and university students in particular lack incentive to obtain a driver's license while attending school, as many campuses restrict access and parking for student vehicles.

50. Recent nationwide data from the Federal Highway Administration and the Census Bureau show that many individuals aged 18 to 20 are not licensed drivers. Approximately 25 percent of 20-year-olds, more than 30 percent of 19-year-olds, and *40 percent* of 18-year-olds lacked driver's licenses. Florida-specific data confirms this pattern at the state level. As of 2024, approximately 20 percent of Florida residents aged 18 to 24 lacked a driver's license, a rate well below the 96 percent possession rate for residents between the ages of 25 and 84.

51. Additionally, tens of thousands of students enroll in Florida public universities as out-of-state students yet ultimately claim their campus home and the state of Florida as their permanent residence. These newly minted Floridians are particularly unlikely to possess a Florida driver's license or state ID. This would not have prevented them from casting a lawful ballot before HB 991; but now, these students will have to take additional steps to obtain new identification to vote for the candidates and policies that will impact the communities they call home.

52. Young voters are not particularly likely to have other forms of ID that HB 991 would accept, either. For example, only 53 percent of voters under the age of 30 have current U.S. passports, which require significant fees and lengthy processing times to obtain. Only 13.8 percent of Florida residents hold a concealed carry license, and most individuals ages 18 to 20 were prohibited from holding such licenses until very recently. Under these circumstances, it is likely that thousands of Florida students lack any form of ID that would qualify as voter ID under HB 991.

53. Accordingly, student voters—who are overwhelmingly young, new voters—will need to obtain an alternate form of ID to be able to vote. And they face unique barriers to do so at every step of the process.

54. Under the Real ID Act, Florida requires new applicants for a Florida license or state ID, including individuals with an out-of-state license, to provide several documents that students are particularly unlikely to have at all—or, at least, have with them where they are living and attending school. For instance, applicants for a Florida license or state ID are required to present a U.S. birth certificate, a valid U.S. passport, a consular report of birth abroad, or a certificate of naturalization or citizenship.

55. Florida driver's license applicants must also provide a document including their full name and Social Security Number, such as a Social Security Card, W-2, or paycheck. But students are far less likely than the rest of the adult population to be employed and thus would lack a W-2 or paycheck. And even if a student has a Social Security Card *somewhere*, many lack ready access to it.

56. Finally, applicants for a driver's license or state ID must show proof of residency by presenting, for example, a recent bill in the student's name, a bank statement, or a medical bill. But again, students are less likely to have these sorts of documents than older voters, given that full-time students are more likely to live in dorms, rent, and have roommates, and they are thus less likely to pay bills directly. Students are also more likely to be on their parents' health insurance, less likely to have a W-2, and less likely to maintain possession of important identity documents at their college residence out of the fear that they might be misplaced or lost.

57. Even if a student voter *could* overcome these obstacles to obtaining photo ID other than their student ID, many will not learn that they cannot use their student IDs until they arrive at the polls to vote. Without an accessible alternative, they will be forced to cast a provisional ballot, opening them up to burdensome ballot-curing procedures if the State's signature-matching process produces a mismatch, and in many instances with too little time to produce the necessary documents to cure. This complex web of regulations will inevitably lead to disproportionate rates of

disenfranchisement among Florida's youngest eligible voters. *See Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308, 2026 WL 2879700, at *2 (U.S. Sep. 25, 2026) (per curiam) (recognizing that a voter's "need to take … affirmative steps to avoid risk of harm," such as providing additional proof of citizenship to have one's vote counted, "constitutes a cognizable injury" (quoting *Meese v. Keene*, 481 U.S. 465, 475 (1987))).

58. This is particularly so because Florida's signature-matching scheme for mail-in and provisional ballots has a notorious history of disenfranchising eligible voters. *See, e.g.*, *Democratic Executive Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319–21 (11th Cir. 2019) (finding Florida's then-existing signature-matching scheme "made it nearly certain to incorrectly reject the ballots of some legitimate voters" and "impose[d] at least a serious burden on the right to vote"); *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943, at *3 (N.D. Fla. Oct. 16, 2016) (noting the lack of "formalized statewide procedure[s]" for signature matching and disparate results across counties). Studies have also shown that young people are more likely to have a ballot rejected for a signature mismatch than older voters.

59. And for all the reasons outlined above, *supra* ¶¶ 49–57, students who fail to overcome the signature match process are less likely to possess the required identification documents to cure their provisional ballots and have their votes counted.

60. In fact, courts have recognized that young Florida voters have had provisional ballots rejected at disproportionately high rates. In one recent case, the record revealed that, during the 2016 election, Florida "voters aged 18 to 21 had provisional ballots rejected 'at a rate more than *four times higher* than the rejection rate for provisional ballots cast by voters between the ages of 45–64.'" *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1219 (citation omitted).

61. In short, HB 991's Student ID Ban will inevitably and disproportionately abridge and deny access to the franchise for young, student voters—and not because they are ineligible, failed to

timely register, or are trying to cast a fraudulent ballot. Rather, these voters will face disenfranchisement simply for relying upon a form of voter ID that the State had accepted for more than 20 years without issue, and they will either be unaware that they needed to obtain an alternative acceptable form of voter ID or unable to obtain one within the timeframe needed to cast a ballot.

**IV. HB 991's Student ID Ban does not advance legitimate state interests.**

62. While HB 991's Student ID Ban will have serious consequences for Florida's youngest voters, it does not advance any legitimate state interest whatsoever. The law's proponents advanced two purported justifications. They claimed that: (1) a student ID does not prove that someone is a resident of Florida or otherwise eligible to vote; and (2) student IDs are falsifiable or otherwise unreliable. Both are straightforwardly pretextual.

63. At the press conference that Governor DeSantis called before signing HB 991, he defended the Student ID Ban as necessary because "a student ID does not mean you are a resident of the state of Florida. Student ID means you're going to school." The bill's proponents made the same point on the Senate floor.

64. This defense of the Student ID Ban is nonsensical for at least two reasons. First, *most* forms of acceptable voter ID under HB 991 do not contain a voter's address, or otherwise identify the voter as a resident of Florida—including passports, U.S. uniformed services or Merchant Marine ID, veteran health ID cards, concealed carry licenses, and other government-issued ID, such as an employee ID. In fact, the only documents that *would* confirm Florida residence are Florida driver's licenses and ID cards.

65. Second, a voter establishes their eligibility to vote—including by verifying their Florida residency—at the registration stage, not at the polls. When submitting Florida's voter registration form, all prospective voters must list a Florida residential address and certify, under penalty of perjury, that they do in fact reside in Florida.

66. The voter ID requirement, on the other hand, has only ever existed to verify a voter's identity—not their qualifications. Legislators highlighted this distinction during debate on the bill. For example, Senator Polsky tried to clarify that voters provide all "information of where [they are] living" when they "register to vote." She went on to explain that voter "ID just proves that I am who I say I am. It has nothing to do with registration." HB 991's supporters were unmoved, responding only that the other permitted forms of ID are government-issued and therefore reflect "a process in which that person . . . has proven their identity."

67. None of HB 991's supporters identified any deficiency in a student ID's ability to verify a student's identity. Their misplaced focus on proving residency admits that the Student ID Ban was never about voter identification at all, but rather about treating students as something other than genuine Florida voters.

68. The other interest the state advanced is equally unsupportable. At his press conference, Governor DeSantis suggested that student IDs are "not secure." In the Senate, Senator Grall also defended the bill with the argument that "almost anyone can print an ID card in their house," and noted that not "[a]ll universities are . . . public universities." She likewise argued that student IDs are "not as trustworthy as a government issued ID, and that is the overall issue."

69. This purported concern withers under any amount of scrutiny. First, the legislative record offers zero evidence whatsoever indicating that student IDs lack adequate "security" to serve as voter ID. When pressed, Senator Grall stated quite plainly that she did not have any "specific information on the creation of the student ID process in terms of how secure that is" or "whether or not those identification cards can be counterfeit." And she further stated she did not "know what the security mechanisms are around the state and university and state college ID process." The notion that student IDs are "not secure," despite their tendency to facilitate many consequential aspects of student life, including providing access to residence halls and allowing for electronic payment of

campus services,[5] is therefore entirely fabricated. Unsurprisingly, the legislative record is utterly devoid of evidence that anyone has ever perpetrated voter fraud by using a student ID to identify themselves at the polls.

70. Second, any purported security concerns would not explain the exclusion of *government-issued* student IDs from the list of acceptable voter ID. Even the bill's proponents in the Senate appeared to recognize a distinction between state and private universities. For example, when asked whether public university IDs are unreliable, Senator Grall responded with redirection, emphasizing that the pre-HB 991 voter ID provision "list[ed] any student identification card."

71. In light of this distinction, several legislators asked whether the bill's proponents would be open to a compromise provision that would allow students attending public colleges and universities to use their student IDs—which are government issued—at the polls. This change would have ensured that HB 991 treated all government-issued IDs the same. In response, Senator Grall did not dispute the merits of such a change. Instead, she flagged that the Student ID Ban "is a provision that was important to the House," and she did not know whether she "ha[d] the ability to negotiate that component of the bill right now because [they] did get a lot."

72. When Representative Eskamani proposed an amendment in the House that would have permitted young Floridians to use student IDs from state universities and Florida College System institutions to vote, not a single legislator spoke in opposition or explained why this amendment was undesirable or unworkable. The amendment was nevertheless rejected.

---

[5] *See* Fla. State Univ., FSUCard, https://fsucard.fsu.edu/ (last visited Oct. 14, 2026) (noting that student IDs "provide[] access to buildings, including Residence Halls [and] libraries," are "required for Meal Swipes," and serve as a "pass for free transportation").

73. In Representative Eskamani's words: "There's just no legitimate reason to allow all other governmental type of IDs while not allowing for government student IDs to be included. There's just no legitimate reason for that."

## CLAIMS FOR RELIEF

### COUNT I
### Denial or Abridgement of the Right to Vote on Account of Age
### U.S. Const. amend. XXVI; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201–2202

74. Plaintiff realleges and incorporates by reference paragraphs 1 through 73 of this Complaint as if fully set forth herein.

75. The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age."

76. By prohibiting any abridgment of the right to vote on account of age, the Twenty-Sixth Amendment mirrors the Fifteenth Amendment, which provides that voting rights "shall not be denied or abridged . . . on account of race, color, or previous condition of servitude." U.S. Const., amend. XV, § 1. Accordingly, at the time the Twenty-Sixth Amendment was adopted in 1971, Congress would have understood its text to have similar scope to the Fifteenth Amendment, which prohibited not only express race-based restrictions, but also facially race-neutral restrictions that were "motivated by a discriminatory purpose." *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (citing *Guinn v. United States*, 238 U.S. 347 (1915)), *superseded by statute on other grounds*, 96 Stat. 134.

77. Federal courts have held that "the Twenty-Sixth Amendment" should be "interpret[ed] . . . *in pari materia* with the other voting-rights amendments." *Grant v. Belangia*, 188 F.4th 317, 328 (4th Cir. 2026); *see also id.* ("[T]he Twenty-Sixth Amendment's text, structure, and history demonstrate its purpose to place age-based restrictions on adult citizens' electoral

participation within the same family of constitutional prohibitions as other forbidden bases for denying or abridging the right to vote."); *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1221 (applying the Fifteenth Amendment's *Arlington Heights* standard to a Twenty-Sixth Amendment claim).

78. Congress and the courts have also recognized that the Twenty-Sixth Amendment has "particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825 (1971) (statements of Sens. Charles Percy and Edward Brooke)).

79. The Twenty-Sixth Amendment therefore not only lowers the voting age to eighteen, but also prohibits age discrimination in voting, including facially age-neutral restrictions that are motivated by an age-discriminatory purpose. *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222–23; *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220, 223 (Colo. 1972) (holding based on "[h]istory and reason" that the Twenty-Sixth Amendment's "prohibition against denying the right to vote to anyone eighteen years or older by reason of age applies to the entire process involving the exercise of the ballot and its concomitants").

80. State laws that erect arbitrary barriers to interfere with young voters' access to the franchise "abridge" the right to vote within the meaning of the Twenty-Sixth Amendment. The standard is not whether the law prevents young voters from voting, or even whether the law carries a significant risk of disenfranchisement. Rather, "the voting rights amendments create an anti-discrimination framework for assessing abridgment[,]" meaning a state law "abridge[s]" the right to vote for a class of voters "if it imposes burdens on them because of a protected characteristic." *Grant*, 188 F.4th at 330. Put simply: "[A] voting law cannot make it harder for one group to vote than another because of their age." *Id.* at 331.

81. The Student ID Ban violates the Twenty-Sixth Amendment by targeting a population that is overwhelmingly young with new burdens to access the franchise, intentionally abridging their right to vote on account of age. With this law, the Legislature took the nearly unprecedented step of eliminating a form of voter ID the on which the State had allowed eligible voters to rely for decades. Voters who rely on student ID to vote are overwhelmingly young, and because of their age, they are far less likely to have a form of ID that remains authorized under HB 991. Because of the Student ID Ban, these young voters—and *only* these young voters—must overcome additional obstacles to access the polls and cast an effective ballot. These burdens may be difficult, or even impossible, for a student voter to overcome in time for an election.

82. Under HB 991, Floridians may rely on any form of government-issued photo ID in their possession—*except* student ID. HB 991 thus "make[s] it harder for [students] to vote than [other Floridians] because of their age." *Id.*

83. It is no answer that student voters without qualifying ID may submit a provisional ballot. The discriminatory treatment of young voters alone violates the amendment, and "the state's ability to point to alternative avenues of voting does not cure an age-based abridgment of voting opportunity." *Id.* at 333.

84. And, as a practical matter, provisional ballots carry considerable uncertainty, requiring the voter to take additional steps to ensure their vote is ultimately counted. Indeed, if the State's notoriously error-prone signature-matching process produces a mismatch between the voter's provisional ballot and the registration books, the voter will have to move quickly to cure their ballot—including by hunting down new forms of ID. Standard ballots at a polling place do not come with these additional burdens. Thus, provisional ballots notwithstanding, HB 991 violates the Twenty-Sixth Amendment by denying student voters equal "access [to] a lawful method of casting a ballot." *Id.* at 331.

85. The interests that lawmakers have advanced in defense of their decision to target student voters with HB 991 "reek of pretext." *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222. Their justifications have no basis in fact and bear no logical relationship to what HB 991 actually does. As described above, *supra* ¶¶ 63–73, the State's purported interest in banning the use of student ID at the polls because it does not prove Florida residency is blatantly pretextual because *most* forms of voter ID that HB 991 still allows likewise do not prove Florida residency. In fact, many of these documents—like passports—suggest even *less* about the voter's residency than an ID from a Florida university. Florida has also never relied on the ID a voter presents at the polls to verify residency, because a voter's eligibility is determined at the registration stage.

86. The state's purported interest in warding off security issues with student IDs is likewise nonexistent. Lawmakers admitted they knew nothing about how universities safeguard the reliability of their student IDs. They also conceded there has not, to their knowledge, ever been a *single* instance of voter fraud perpetrated through use of student ID at the polls.

87. The Legislature also rejected a more narrowly tailored amendment to HB 991 that would have alleviated any purported concerns about IDs issued by unregulated third parties by permitting only student IDs issued by public institutions at the polls. Lawmakers offered nothing to refute the merits of this approach.

88. Worse yet, the State's surgical targeting of young voters—specifically *student* voters—is now a pattern. Not long ago, a Florida court rightly held that the Secretary of State decision categorically barring early voting on college and university campuses likely violated the Twenty-Sixth Amendment. *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1210. The court found the move to be "unexplainable on grounds other than age because it bears so heavily on younger voters." *Id.* at 1222.

89. Just so here. HB 991 was plainly driven by animus against young voters. The Student ID Ban, much like the on-campus early-voting ban in *League of Women Voters of Florida*, "bears [most] heavily on younger voters." *Id.* The absence of any evidentiary basis for the Legislature's purported interest in the Ban, compounded by its rejection of an amendment tailored to address any conceivable concern and Governor DeSantis's own statements—which portrayed a view of students as something other than legitimate Florida voters—show that the Ban "is unexplainable on grounds other than age." *Id.*

90. This intentional abridgement of young voters' rights violates the Twenty-Sixth Amendment. *See id.*; *see Vill. Of Arlington Heights v. Metro. Housing Dev.*, 429 U.S. 252 (1977) (explaining that discriminatory purpose is established by the totality of the circumstances, including but not limited to the law's discriminatory impact, historical background, and departures from normal procedures).

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment:

a) Declaring that the Student ID Ban violates the Twenty-Sixth Amendment to the U.S. Constitution;

b) Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Student ID Ban;

c) Awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d) Granting such other and further relief as the Court deems just and proper.

**COUNT II**
**Disparate Treatment of Voters in Violation of the Equal Protection Clause of the Fourteenth Amendment**
**U.S. Const. amend. XIV, § 1; 42 U.S.C. § 1983**

91. Plaintiff realleges and incorporates by reference paragraphs 1 through 73 of this Complaint as if fully set forth herein.

92. The Fourteenth Amendment of the U.S. Constitution guarantees "equal protection of the laws." This includes a "constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (collecting cases); *Bush v. Gore*, 531 U.S. 98, 105 (2000) (holding states have an "obligation to avoid arbitrary and disparate treatment of the members of [the] electorate"); *Lee*, 915 F.3d at 1319 (holding voters "enjoy a Fourteenth Amendment right to participate equally in the electoral process" (citation modified)). So "[t]he Equal Protection Clause applies when a state either classifies voters in disparate ways or places restrictions on the right to vote." *New Ga. Proj. v. Raffensperger*, 484 F. Supp. 3d 1265, 1293 (N.D. Ga. 2020).

93. When "a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, the court reviews the claim under the *Anderson-Burdick* flexible standard." *Id.* (citing *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012)); *see also Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1230 (11th Cir. 2025) (applying *Anderson-Burdick* to equal protection challenge).

94. Under this framework, a court considering a challenge to a state election law must carefully balance the character and magnitude of the law's burden on the right to vote against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). In disparate-treatment cases, courts must "consider the burdensome effects of disparate treatment on the right to vote

. . . from the perspective of only affected electors—not the perspective of the electorate as a whole." *Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir. 2020).

95. Election practices imposing severe burdens on the right to vote "[must] be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992).

96. But when a law burdens the right to vote, some degree of heightened scrutiny applies regardless of the extent of the burden. "However slight" the burden on voting rights may appear, "it must be justified by relevant and legitimate state interests '*sufficiently weighty to justify the limitation*.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality opinion) (emphasis added) (quoting *Norman*, 502 U.S. at 288–89)); *see also Lee*, 915 F.3d at 1318–19 ("[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden."); *Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 306 (3d Cir. 2025) (noting that "[t]he relevant burden need not be severe" to trigger *Anderson-Burdick* balancing), *petitions for cert. pending sub nom Republican Nat'l Comm. v. Eakin*, No. 25-962, 25-967 (U.S. Feb. 13, 2026).

97. A burden on the right to vote need not be insurmountable before it can be deemed a more-than-minimal burden. *See, e.g.*, *Perez-Guzman v. Gracia*, 346 F.3d 229, 241 (1st Cir. 2003). Rather, the risk that "legitimate[ly]" cast votes will be "rejected" due to "factors out of [the voter's] control" imposes a "serious burden on the right to vote." *Lee*, 915 F.3d at 1321; *see also Democratic Exec. Comm. v. Detzner*, 347 F. Supp. 3d 1017, 1030 (N.D. Fla. 2018) ("Disenfranchisement of approximately 5,000 voters based on signature mismatch is a substantial burden.").

98. Moreover, in the context of disparate-treatment claims, when a law "facially discriminates between two classes of electors . . . the burden that law places on the right to vote is more than minimal." *Mays*, 951 F.3d at 786. That is true even if the classification is not otherwise

constitutionally suspect. *See id.* (applying this rule to a law that distinguished between "hospital-confined [electors] and everyone else" in establishing deadlines to request absentee ballots).

99. At the next stage of the inquiry, courts must "identify and evaluate the *precise interests* put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789 (emphasis added). In all cases, the question is whether "the proffered State interests justify the burden the [restriction] imposes." *Eakin*, 149 F.4th at 314. To do so, the court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it *necessary* to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789 (emphasis added).

100. Importantly, when assessing state interests, courts consider *only* the interests actually advanced by the state—they do not substitute a state's reasoning for their own judgment in search of any rational defense of the law. *See id.* Courts also need not, and should not, accept a state's justifications at face value—particularly where those justifications are "speculative." *Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018) (citing *Pub. Integrity All. v. City of Tucson*, 836 F.3d 1019, 1024–25 (9th Cir. 2016) (en banc)). Otherwise, courts risk "convert[ing] *Anderson*[-]*Burdick*'s means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Id.*; *Eakin*, 149 F.4th at 313 ("*Anderson-Burdick* is not simply another name for rational basis review, even if a law imposes only a minimal burden.").

101. HB 991's Student ID Ban facially discriminates against one class of voters: student voters. In addition to eliminating student IDs from the list of acceptable voter ID, HB 991 likewise exempts student IDs from a broad catch-all provision allowing voters to use *any* photo ID issued by the State of Florida, a Florida locality, or the federal government to access the polls. "The statute sets students apart in this respect." *Luft v. Evers*, 963 F.3d 665, 677 (7th Cir. 2020). Eligible Floridians

may use any government-issued photo ID in their possession to vote, aside from those issued by educational institutions.

102. HB 991's disparate treatment of students burdens this class of voters' right to access the franchise, thereby triggering *Anderson-Burdick* review. Once HB 991 takes effect, many students will lack qualifying photo ID to access the polls. Student voters are less likely than other Florida adults to have another form of voter ID allowed under HB 991. So student voters—and *only* student voters—will be required to obtain new government-issued photo ID to cast a regular ballot.

103. Because the Student ID Ban "facially discriminates between two classes of electors," that is, "[students] and everyone else," HB 991's burden on the right to vote is necessarily *at least* "more than minimal." *Mays*, 951 F.3d at 786.

104. Carefully assessing HB 991's impacts in fact reveals at least a "serious," if not severe, burden on student voters. *Lee*, 915 F.3d at 1321. It will be more difficult for many student voters to obtain new photo ID that complies with HB 991, for a variety of reasons. *Supra* ¶¶ 49–57. For example, students attending school far from where they were raised may not have ready access to the records required to obtain qualifying ID like a Florida driver's license. They also may lack reliable transportation to the DMV, particularly given variable class schedules. These barriers may not be surmountable before it is time to vote.

105. The State cannot adequately justify the burden HB 991 imposes on students' right to vote because the Student ID Ban does not advance either specific interest the State identifies. Even without applying more searching *Anderson-Burdick* review, HB 991's Student ID Ban *still* fails even garden-variety rational basis review. The State entirely lacks a rational basis for the distinction it draws between one form of government-issued ID—student IDs—and all others.

106. For the same reasons explained above, *supra* ¶¶ 63–73, the legislative record is devoid of any rational explanation for singling out student IDs as the only government-issued photo ID that is no longer acceptable to access the polls.

107. Ultimately, the Legislature never identified any deficiency unique to student ID that distinguishes it from the many other forms of government-issued photo ID that HB 991 otherwise leaves untouched.

108. Courts confronting materially identical, and similarly arbitrary, distinctions have struck them down as violating the Equal Protection Clause—even under rational-basis review. *See Luft v. Evers*, 963 F.3d at 677 (holding that a Wisconsin law subjecting student ID to requirements it did not impose on any other form of voter ID violated the Equal Protection Clause because the state did not so much as "tr[y] to justify [the] distinction").

109. The same defect infects HB 991: the Legislature has never explained, and cannot explain, why the Student ID Ban is necessary. HB 991's Student ID Ban lacks any rational basis, and it thus violates the Fourteenth Amendment to the U.S. Constitution irrespective of the law's burden on the right to vote.

110. **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment:

a) Declaring that the Student ID Ban violates the Fourteenth Amendment to the U.S. Constitution;

b) Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Student ID Ban;

c) Awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d) Granting such other and further relief as the Court deems just and proper.

**COUNT III**
**Undue Burden on the Right to Vote**
**U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201–2202**

111. Plaintiff realleges and incorporates by reference paragraphs 1 through 73 of this Complaint as if fully set forth herein.

112. The general "right to vote" is "implicit in our constitutional system." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973). And the courts afford special protections for this "precious" and "fundamental" right. *Harper v. Va. State Bd. Elections*, 383 U.S. 663, 670 (1966).

113. The First and Fourteenth Amendments work in tandem to safeguard this right, preventing states from burdening the right to vote unless such burdens are necessary to justify correspondingly important state interests. *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. Courts rely on the *Anderson-Burdick* framework, *supra* ¶¶ 93–96, to assess claims that a state has unduly burdened the right to vote, as well. *Lee*, 915 F.3d at 1318–19.

114. HB 991 unduly burdens the right to vote and cannot satisfy any level of *Anderson-Burdick* scrutiny. The Student ID Ban imposes "serious," if not severe, burdens on the right to vote for young voters in Florida, for the reasons explained above. *Supra* ¶¶ 103–05; *see Lee*, 915 F.3d at 1321. It requires students without another form of qualifying ID to obtain new documentation that they are less likely to have, and which are especially difficult for students to get—for example, because they may lack access to required records or necessary transportation. For many students, it will be impossible to surmount these barriers in time to vote. But the Student ID Ban fails even if the burden is treated as minimal because there is *no* connection between this new distinction and any colorable state interest—much less one that justifies burdening students' right to vote. *Supra* ¶ 106.

115. Because the Student ID Ban does not remotely advance the state interests identified in defense of the bill, they cannot justify the resulting burdens on access to the franchise. It thus

unduly burdens the right to vote of Plaintiff's members and other Florida voters in violation of the First and Fourteenth Amendments.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment:

a) Declaring that the Student ID Ban violates the First and Fourteenth Amendments to the U.S. Constitution;

b) Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Student ID Ban;

c) Awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d) Granting such other and further relief as the Court deems just and proper.

Dated: October 16, 2026

Respectfully submitted,

*/s/ Frederick S. Wermuth*
**FREDERICK S. WERMUTH**
FL. Bar No. 0184111
**QUINN B. RITTER**
FL Bar No. 1018135
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 E. Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
fwermuth@kbzwlaw.com
qritter@kbzwlaw.com

**ABHA KHANNA***
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

**RICHARD MEDINA***
**NICOLE E. WITTSTEIN***
**TORI A. SHAW***
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: (202) 948-1135
rmedina@elias.law
nwittstein@elias.law
tshaw@elias.law

** Pro Hac Vice Applications Forthcoming*

*Attorneys for Plaintiff Florida State Conference of Branches and Youth Units of the NAACP*